JEANNE MARIE J. GIVERNAUD

*v.*

CHARLES L. GIVERNAUD et al.

[Submitted November 11th, 1912. Decided December 6th, 1912.]

1. A court of equity will not entertain a suit to open a final decree of divorce after the spouse that obtained it is dead; but, where the decree was obtained fraudulently, the defrauded spouse may maintain a suit for the enforcement of any civil right notwithstanding that the decree, if honest, would be a complete bar.

2. A bill of review to set aside a fraudulent divorce after the death of the other spouse, which states that the object of setting it aside was to prevent the bar of limitations from interfering with the collection of a judgment rendered forty years before, will be held good as a bill to collect the judgment.

3. Where a wife obtained a limited divorce in France charging adultery, the only divorce allowed at the time, and got a judgment against the husband, and he came to America, got an absolute divorce, married again, grew wealthy, and had many relatives living in the vicinity of his first wife, during which time she refused to have anything to do with him and did not attempt to collect the judgment, she will not be allowed to recover the judgment forty years after, and after his death, claiming that she did not know that he had obtained an absolute divorce.

---

On bill, answers, replication and proofs taken in open court, and depositions taken in France.

*Mr. J. Rufus Besson* and *Mr. Maurice Leon* (of the New York bar), for the complainant.

*Mr. Abel I. Smith, Mr. John S. Mabon, Mr. George Malraison* (of the New York bar), and *Mr. Gilbert Collins,* for the defendants.

STEVENSON, V. C. (orally).

My conclusion in this case is that the bill of complaint must be dismissed.

1. The bill is filed as a bill of review, or a bill in the nature of a bill of review. A petition was presented to the court for leave to file the bill. An order was made permitting the bill to be filed, and the consent of the court was further endorsed by the hand of the vice-chancellor on the back of the bill. I have a very grave doubt that, in a divorce case where a decree has gone by default, the case having been tried *ex parte* in the lifetime of the parties, at any time before the enrollment of the decree, after the enrollment of the decree, within the time allowed for an appeal in a contested case, or after such period has elapsed, the correct method of obtaining on behalf of the defendant a right to contest the case is by a bill of review rather than by a petition in the cause setting forth the default—setting forth the fact that the defendant had not been heard in the case at all—setting forth, further, that application was made at the earliest moment possible, and then setting forth the merits which underlie—must underlie—the application. I think at present the court of chancery has full power at all times during the lifetime of the parties to hear a defendant in the cause where the divorce has gone against him or her by default, who alleges that the decree was obtained by fraud, and that he or she, as the case may be, has only recently received actual notice of either suit or decree.

We have, however, this bill filed as a bill of review setting forth, or attempting to set forth, a cause of action in equity. It is not such an application as I mentioned a moment ago, which is made during the lifetime of the parties. This application is made to the court after the death of the husband, who obtained a decree of divorce *ex parte,* and it is very plain both from the fact that this bill was filed as a bill of review and also from the frame of the bill, and particularly of the prayer, that the pleader had in

view as a complete cause of action in equity the setting aside of this decree of divorce on the ground of fraud.

The bill assigns the reason why the complainant—the defendant in the divorce suit—comes into this court with such a bill. She says that she recovered a judgment for forty-four thousand francs against her husband, now deceased, in 1866, in France, where both parties were then domiciled, and the reason why she wants to have the decree of divorce opened is not a sentimental one—not for any vindication of her character against the charge of desertion which her husband made and proved *ex parte*. She has a very practical reason; she says,

"I want my money—my judgment for forty-four thousand francs," equivalent to over eight thousand dollars, "and I cannot obtain any remedy for the collection of that judgment because I am barred by the statute of limitations which began to run in 1872 when this fraudulent divorce was obtained. I, therefore, desire to have a decree of this court vacating that decree of divorce and leaving me at liberty to proceed for the collection of my judgment in any court of competent jurisdiction, law or equity."

And I may say, in passing, that a question is suggested right on the face of this case, whether in case the divorce were set aside the action of the widow, as she then would be, against her husband's executor would be at law or in equity. If her judgment is only enforceable in equity—if her case is equitable—the mere death of her husband, by which she is able to sue his executors in a law court, would not give the law court any jurisdiction, because the incapacity of the law court to take jurisdiction of such a case does not arise out of the fact that the litigation is between a man and wife; it arises from the fact that the cause of action is purely equitable, of which the court of law can take no cognizance.

But I do not want to pursue this thought further, I only intended to say that the question arises, or might arise, what the remedy of Mrs. Givernaud for the collection of this money would be in case the decree of divorce were vacated and she stood now before the courts of this state as the widow of her husband, seeking to recover from her husband's executors the amount of this judgment of a French court, rendered forty-six years ago when

both parties were citizens of France and were domiciled in France.

I do not think that any such equitable action will lie as the pleader had in mind when he drew this bill and framed the prayer for relief and obtained leave to file the bill as a bill of review. In other words, it seems to me that the court of chancery of New Jersey will not entertain an application in any form, either by bill of review or by petition in the cause, to open a decree of divorce—final decree of divorce—when the party, the spouse who obtained it, is dead. The subject-matter of the litigation in a divorce suit is the marriage relation, the status of marriage, and that has perished—that has been destroyed by the death of one of the spouses.

It is difficult to see what would be the result of the opening of this decree of divorce. The husband could not contest the case any further. The effect would seem to be that immediately upon opening the decree the court must recognize the fact that the suit has abated without hope of revival, and so the result of opening the decree would be not to recognize the litigation and give the complainant an opportunity to try his case and the defendant to defend, but to have the whole litigation immediately puffed out of existence.

I have considered the authorities which have been submitted, and which are conflicting, in regard to the status of a fraudulent decree of divorce after the death of the party who obtained it, and my conclusion is that no direct application is proper to open the decree, but the defrauded spouse may bring a suit for the enforcement of any civil right in any appropriate court in the State of New Jersey and obtain such enforcement, notwithstanding the fact that the decree of divorce, if honest and valid, would be a complete bar.

Generally, an adjudication that the decree of divorce was void would be made by the court in which the spouse—we will say the wife—was undertaking to prosecute her claim. If, however, for any reason the court of law should consider that it could not entertain the attack of the wife upon the validity of the divorce—if by applying the rule against collateral attack or for any reason the court of law should reach that conclusion—it may be that the

wife would have to file her bill in this court to enjoin the other party in the lawsuit from setting up the divorce. In one way or another it seems to me that where a spouse has been defrauded— the wife, we will say—by a decree of divorce obtained by imposition upon this court and the husband has died before she was able to learn about it and attack the decree, she can then maintain an action against the heir for dower and, either in that proceeding or in a proceeding in this court in aid of her suit for dower, have the impediment from the fraudulent divorce removed.

Mrs. Givernaud might assert a variety of rights as widow of Mr. Givernaud. She might wish to contest the probate of the will. She does not say in her bill that she has the slightest claim against the probate of that instrument. She might also, as I said a moment ago, wish to recover her dower in a large amount of valuable real estate. She does not assert in her bill that her husband left any real estate, or that she has any claim to dower. If she had, she can, as I have said, take the appropriate action to have her right of dower enforced, and she could have an adjudication either in the court where she was proceeding to get her dower or in this court, which would sweep aside the fraudulent divorce as a defence if she proved that it was fraudulent, and that she could have had it vacated if her former husband were alive.

What Mrs. Givernaud has in view as the object of this suit, or rather the ultimate object of the litigation or litigations which this suit initiates, is the recovery of the forty-four thousand francs out of her husband's estate, and that is the sole ground upon which she comes into court now and asks to have this decree of divorce set aside.

The slightest reflection will show how great a variety of possible claims a woman may have in the situation of Mrs. Givernaud, and the theory of the pleader is that he can file a bill in the nature of a bill of review and have the fraudulent divorce vacated, and then the woman can look around and determine what she will do—whether to bring an action for dower against some heir or devisee, or bring some proceeding to have the validity of the probate of the will contested, or collect money that is due her and be rid by her decree setting aside the divorce of the

bar of the statute of limitations, or bring no further action of any kind in the absence of any enforceable claim as widow.

My conclusion is that a spouse cannot do that—cannot maintain that kind of suit. I indicated this view to counsel at the opening of the case, and my examination of the authorities and further reflection upon the subject only strengthen my view that we must regard this bill as an original bill, filed by Mrs. Givernaud to collect forty-four thousand francs out of the estate of her deceased husband.

Undoubtedly, the original theory of the framer of this bill, as counsel for the complainant fully explained at the opening of the case, was that it was a bill of review, and that the allegations setting forth the recovery of the judgment for forty-four thousand francs were inserted merely to show the court that there were substantial rights involved—that the complainant was not merely exploiting a sentimental case for the sake of escaping from the reproach of being a divorced woman, but, on the contrary, had a very substantial interest in the estate of Mr. Givernaud which, however, she could only recover by having the divorce set aside so that the statute of limitations would not be a bar to her proposed future action in some court for the recovery of her forty-four thousand francs. The bill, however, although styled a bill of review, and filed as such, in my judgment, as I pointed out to counsel, presented an independent cause in equity for the recovery of the forty-four thousand francs against the executors of Mr. Givernaud, who were made defendants, and no objection had been made on the ground of multifariousness or misjoinder.

Counsel for the complainant then positively declared that he intended to ask for a decree for the amount of the complainant's judgment, and did not intend to stop merely with a decree setting aside, on the ground of fraud, the divorce which Mr. Givernaud had obtained. Such relief was plainly within the scope of the premises of the bill and could be granted by a court of equity under the general prayer, notwithstanding that the complainant may not have originally intended to ask for any other relief than the vacation of the decree of divorce.

The cause then proceeded, all parties being distinctly notified

of the nature and extent of the complainant's case which would be presented to the court for determination upon the evidence.

The question whether this bill might be maintained, not as a bill of review but as presenting an independent cause of action in equity, the object of which is to set aside a decree of a court which had been obtained by fraud, it being a matter of no consequence whether the alleged fraudulent decree had been obtained in the court of chancery of New Jersey or in some other court of this state or of a foreign state, was not raised. If such a claim, however, had been within the theory of the bill, it was exceedingly improper and misleading to go through all these forms required to give it the name and character of a bill of review.

There being no argument on the subject, I have dealt with the bill only in two aspects, namely, as a bill of review, the object of which would be accomplished according to the complainant's original theory by a vacation of this decree of divorce on the ground of fraud, and also as a bill for the recovery of the amount of this judgment for forty-four thousand francs. The discussion of the bill as presenting an original cause in equity for the setting aside of a fraudulent judgment or decree recovered in a domestic, not a foreign, court, not being suggested in any way during the trial of the cause, and being utterly inconsistent with the character of the bill as a bill of review, would involve some very difficult and, as yet, unsettled questions which I am entirely willing to disregard.

An examination of a few reported decisions with the citations therein contained will disclose these questions in their application to both domestic and foreign judgments: *Dringer* v. *Receiver, 42 N. J. Eq. (15 Stew.) 573; S. C. on appeal, 43 N. J. Eq. (16 Stew.) 701; Kearns* v. *Kearns, 70 N. J. Eq. (4 Robb.) 483; Flower* v. *Lloyd, 10 Ch. Div. 327; Abouloff* v. *Opperheimer Company, 10 Q. B. D. 295; Cole* v. *Langford (1898), 2 Q. B. 36.*

Whether the courts of New Jersey would adopt the broad and somewhat indefinite definition or description contained in the later English cases of the fraud which will afford a sufficient basis for setting aside a judgment of a domestic court by an ordinary suit in a court of equity, may very well be considered a

matter of doubt, especially in view of the narrow action of the court of errors and appeals in the case of *Dringer* v. *Receiver,* which action is erroneously set forth in the reporter's syllabus. It would seem to be quite safe to conclude that if the decree of divorce in this case would not be opened and vacated upon a bill of review, it would not be interfered with upon an independent bill in equity making an original attack upon the decree as fraudulent and invoking the jurisdiction of courts of equity to set aside judgments and decrees, both domestic and foreign, upon the ground of fraud.

No objection has been made in any form to the jurisdiction of this court over this present controversy. It is practically conceded by the parties and their counsel that so far as the forum is concerned, Mrs. Givernaud has made no mistake in whatever aspect her bill is considered. This is a perfectly plain case where the court should not raise any jurisdictional question, and I shall, therefore, dispose of the case on its merits.

2. For fear I may forget it, my attention was called in looking through the papers the other day to a separate and distinct defence set up in the answer of the executor, to the effect that all creditors of Mr. Givernaud's estate were barred by a decree of the surrogate or the orphans court of Hudson county. That defence was not referred to, I think, in the argument. I am not going to deal with it. It seems to be a bar to this action, so far as the executors are concerned, because the bill does not contain any allegations which take the case out of the operation of that decree of the surrogate or the orphans court. Probably, however, the maintenance of such a defence by the executors in the end would not be very beneficial to them. The indications are that there is a large estate here undistributed, and probably the defence was not pressed in order that there might be a final adjudication upon the merits, and therefore I shall not refer to this defence again.

3. Now, then, we come to the case: Mrs. Givernaud and her husband, Louis Givernaud—Charles Louis, is it not, Judge Smith?

Judge Smith—Charles Louis.

The Court—Charles L. Givernaud was married in 1860, in France——

Judge Smith—Louis Barthelemy, I think he called himself.

The Court—Very good. They were married in the year 1860 in France, in Lyons, where they both were domiciled and where I understand they were born and lived. That is forty-eight years before this suit was brought. They lived together as man and wife only for about three or four years—I think until some time in 1864—when they separated and Mrs. Givernaud returned to her parents' home where, I think, it appears she has lived ever since, or until their death.

Mr. Givernaud maintained a sort of separate establishment in Lyons for about two years, part of the time living with his parents—his father. In this brief period of married life it seems there were three children born who have always been with the mother.

In 1866, Mr. Givernaud was engaged with his brothers in the silk business in Lyons. He got into financial embarrassment, or rather the firm did, and the result was bankruptcy. At this time Mrs. Givernaud, who was separated from her husband, and who evidently entertained feelings of great animosity toward him, as did her father, commenced a suit under the French law for a separation of her property from that of her husband, because it was imperiled by his bankruptcy.

Her dowry had been about forty-four thousand francs, and that she wished to recover. She prosecuted that suit and the husband defended it, and on the 7th day of February, 1866, she obtained the judgment which is set forth in this bill and which is the cause of this suit, the judgment being substantially for forty-four thousand francs.

The judgment provides that there should be an abatement of a portion of that decree—four thousand francs of it—equal to the value of such articles of a personal nature, apparel and jewelry, I suppose, as Mrs. Givernaud might recover in kind. The decree of the court was that she was entitled to forty thousand francs; the amount of money that she and her father contributed, and four thousand francs the value of her trousseau, less, however, the value of such articles from that trousseau as

she might recover in kind. I do not find from the papers that there was ever any ascertainment of the value of the things she recovered, if she recovered anything. It makes the status of the judgment somewhat peculiar, but I shall treat the judgment as counsel treated it in their argument as equivalent to an absolute judgment for forty-four thousand francs—a judgment recovered by this woman against her husband.

Let us now see what the circumstances were which characterize the relations of these people to each other in 1866. They not only litigated this matter in the courts relating to the wife's separate property, in which litigation she recovered a judgment for her whole dowry, but immediately the wife further separated herself from her husband. She brought an action for a separation of persons—a limited divorce, the only kind of divorce known at that time to the French law. There was no law providing for an absolute divorce or dissolution of the marriage bond, according to the testimony of the expert—the French lawyer—until 1884, eighteen years after Mrs. Givernaud got her limited divorce. I did not mention the date when she procured this divorce. It was in August, 1866.

In the latter part of February, or the first part of March, 1866, Givernaud, discarded by his wife and repudiated by his wife's father, left France and came to this country and started in business with his brothers, became a citizen of the United States, and prosecuted successfully a large business—a good business which became large—for a great many years, and died finally in Los Angeles, California, where he seems to have been temporarily abiding in 1908, forty-two years after this judgment had been recovered against him. And during the greater part of that period, as is indicated by the testimony in this case, he was absolutely responsible for anything which his wife might recover here upon that judgment against him.

In the suit for limited divorce, the record of which has been put in evidence, it appears that Mrs. Givernaud made most severe and offensive charges against her husband. She charged him with maintaining concubines, I think, in the home of the couple. She charged him with illicit relations with women, and the evidence indicates the bitterness of her hate for this man, and

her desire to be absolutely rid of him, and now in her old age when she is interrogated, upon the commission which was issued in this cause, in regard to what she knew about her husband, she takes pains to show her contemptuous disregard. She wanted to have nothing to do with him whatever. She had recovered her property as far as she could. She obtained her judgment, perhaps collected a part of it in the bankruptcy proceedings, divorced herself from her husband so far as was permitted by the laws of her country, and refrained from making any inquiry about him, although she would not have had the slightest difficulty in obtaining full information. Mr. Givernaud had relatives and friends in Lyons. He was not concealed; his prosperity was known by rumor to Mrs. Givernaud, but she would have nothing to do with him and took no steps to. find him or to collect this judgment, or the remainder of it out of his property in this country.

In view of those facts, which are beyond dispute in this case—in view of the relations between this couple—a rule of law which prevents the statute of limitations from being a bar to any recovery, is simply a hard and fast technicality of the worst kind which courts of equity usually endeavor to avoid if they can.

4. It has often been pointed out that the statute of limitations is not addressed to courts of equity but to courts of law only. Courts of equity, however, are said to enforce the statute by analogy. Several reasons have been assigned for the rule that the defence of the statute of limitations will not be recognized by courts of equity in litigations between husband and wife. Sometimes it has been said that a married couple cannot sue each other in courts of law, and that, therefore, the legal defence of the statute of limitations should not be sustained when they sue each other in a court of equity.

I do not think there is much force in this reasoning, and undoubtedly the main reason for the well-settled rule is founded upon a consideration by courts of equity of the relations of love and confidence which presumably exist between man and wife—the fiduciary relation which must powerfully influence the conduct of persons who are bound by it with respect to each other's property as well as person. Courts of equity will not foster a

litigation between a man and wife which naturally would tend to break up the peace of the home. The plainest reasons pertaining to public policy and the good order of society underlie this rule.

I have very hastily gathered some recent authorities on this subject, which are as follows: *Yeomans* v. *Petty, 40 N. J. Eq. (13 Stew.) 495; Gray* v. *Gray, 39 N. J. Eq. (12 Stew.) 512; Bennett* v. *Finnegan, 72 N. J. Eq. (2 Buch.) 155; Ten Broeck* v. *Jackson, 71 N. J. Eq. (1 Buch.) 582.*

These authorities fully recognize the reasons which I have stated, why courts of equity ordinarily exclude the defence of the statute of limitations from litigations between husband and wife. They also recognize the fact that in ordinary cases the defence of laches in like manner must be excluded. But the authorities hold that the delay of one spouse in bringing his or her action against the other while the status of marriage exists may be fatal under the equitable doctrine of laches. The correct view is that a court of equity must look at all the circumstances of the case without being bound by the hard and fast rule of the statute of limitations imposed upon courts of law, and that the defence based upon undue delay will be sustained or rejected according to purely equitable considerations in view of the equitable doctrine of laches. This is plainly what Chief-Justice Beasley says in his opinion for the court of errors and appeals in the case of *Gray* v. *Gray,* which I have cited.

In the case of *Ten Broeck* v. *Jackson,* which I cited a moment ago, Vice-Chancellor Stevens held that under the circumstances of that case the complainant, who was a widow, was chargeable with laches during the time when she was living with her husband prior to his decease, and such laches barred her of recovery of an alleged debt from her husband's executor. The court of errors and appeals affirmed the decree of this court upon one of the grounds upon which the same was based, without finding it necessary to consider the question of laches. *73 N. J. Eq. (3 Buch.) 734.*

It must be borne in mind, in dealing with all the authorities which recognize the rule to which I have referred, excluding this defence of laches or the defence of the statute of limitations in equitable suits between man and wife, that the

reason for the rule, apart from a bare and as it seems to me inapplicable technicality, consists in the assumption that a relation of love and confidence, the finest and most potent fiduciary relation perhaps known to the law, exists between a man and his wife.

When the couple have separated—when, for instance, the wife has secured a divorce from bed and board in a suit in which she has charged her husband with extreme cruelty under our law or gross violations of his marriage vow, as was done in Mrs. Givernaud's case, in France, in 1866, is it not absurd to apply to the case this rule excluding the statute of limitations from consideration and also excluding the defence of laches? It seems to me there is a very strong reason for sustaining a general rule that where the married couple have been separated for years by a decree of limited divorce under our statute and have never become reconciled, but, on the contrary, have persistently maintained sentiments of bitter animosity so that every particle of love or confidence which may formerly have existed between them has been wholly destroyed, courts of equity will enforce the statute of limitations in all litigations between the so-called married couple.

It is somewhat difficult for me to perceive any sound reason why a woman who has thrown off her husband by a decree of limited divorce and absolutely separated herself from him should be allowed to hold open indefinitely a claim, for instance, for money lent to her husband in former days of confidence, and then obtain a decree in equity for the amount of the loan forty years afterwards, against her husband or her husband's executors.

But I do not have to lay down any such rule in this case, because it is conceded that however courts of equity may regard or disregard the statute of limitations in suits between man and wife, the great equitable doctrine of laches stands on an independent basis and may or may not afford a defence according to equitable considerations.

Now, then, let us see what sort of a case this is for the application of the doctrine of laches. This woman, as I said, recovered a judgment in 1866. The judgment debtor, her husband, died forty-two years later, here in America, where he oc-

cupied a position of prominence in the trade of the country. He had relations with France. This woman had no difficulty in finding out about him, and she does not pretend that she did not know that he was abundantly able to respond if she brought her suit over here in New Jersey—sent her judgment over here. But she waited, and she waited forty-two years, and just see what happened during that interval: Her husband died. Ordinarily, there is a presumption of the payment of a judgment after twenty years. No defence of payment has been set up in this case, and, therefore, I do not deem it necessary to consider how far such a defence, if it had been set up, would have been sustained. The husband undoubtedly knew a great deal about this matter. For all that appears in this case, there might have been payment or a release. At any rate, the husband certainly might, if he had been sued some time during these forty-two years, have thrown some light upon this affair which would have been exceedingly beneficial to him and exceedingly harmful to his wife. We can speculate about the various defences that he might have raised. He might have disclosed facts founding defences which his executors know nothing about. If he were alive he might establish the defence that the judgment had been paid in accordance with the ordinary presumption.

But let us go further and see how the laches of Mrs. Givernaud has injuriously affected the defence, actually set up in this case. The bill admits that the complainant cannot recover a dollar of this money and interest, and I suppose with interest it amounts to something like $25,000, does it not?

Judge Smith—Yes.

The Court—No, no, you stated, although there was no proof on the subject, that twenty-seven and one-half per cent. was paid in the bankruptcy proceedings—ten or fifteen thousand dollars. At any rate, it is a large sum of money, and she admits, and her bill admits, and her counsel admits, that she cannot make any recovery unless the bar of this divorce is removed. She has got to have that bar swept aside in order to recover any portion of this debt, and for forty-two years she has held her claim in abeyance, and for thirty-six years during the lifetime of her former

husband she has held it while this decree of divorce was standing against her on the records of this court.

But she says, "I didn't know of any divorce," and I suppose I am safe in saying that this bill never would have been filed unless Mrs. Givernaud was prepared to swear point-blank that until recently she had no notice that the divorce had been obtained against her. I doubt if any lawyer would have filed a bill if he could not be assured that she would testify to that, that she never heard of this divorce. That lies at the foundation of all her rights which she seeks to assert in this case, and when we take her bill in order to ascertain the grounds on which she seeks to set this decree of divorce aside at this late date we find, I think, two grounds, and one consists in the charge that her husband fraudulently procured a misdirection of the letter which was sent to notify her of the commencement of the divorce suit.

Well, we have to find that she did not know of this suit if she says she did not know of it, and we must consider this charge that in respect to the mailing the notice there was fraud. And she says another ground is:

"My husband fraudulently concealed from the court the fact that I was living under a decree of separation which I recovered or obtained in France in August, 1866. It is true I began my suit after Mr. Givernaud had come to this country and he was not served with any process, nor was any notice of my suit published in a newspaper or sent to him by mail, but he knew about my suit; he got actual notice of it."

Now, it will be observed that the complainant wishes to maintain that she did not know about the institution of the New Jersey divorce suit, or that a divorce had been obtained afterwards at any time, and also that her husband did know or get notice of the French divorce which she had obtained.

Well, is this court to-day in the situation that it would have been in if this suit had been brought earlier, with reference to the ascertainment of the facts of the case and the hearing of both sides? Lutjen v. Lutjen, 64 N. J. Eq. (19 Dick.) 773; Ten Broeck v. Jackson, supra.

Not only Mr. Givernaud has died, but about fifteen years ago Mr. John C. Besson, the lawyer who recovered this decree of divorce in New Jersey in 1872, and who, according to the theory

of the bill, was the unconscious instrument by which this man perpetrated a gross fraud, also died. It appears from the papers in evidence that Mr. Besson, a practitioner of ability and integrity, attended personally to the business of mailing the notice.

See what a disadvantage these executors are under when they are resisting this old, stale claim which this woman makes and which she has kept unenforced, unrecognized, unasserted for forty-two years, up to the time of Mr. Givernaud's death, and for forty-four years prior to the institution of this present suit. It seems to me that if ever there was an ideal case for the application of the great equitable doctrine of laches this is such a case.

5. Let us suppose, now, that I am in error in the view that I have expressed or indicated, in regard to the power of the court of chancery, on the ground of fraud, to vacate a decree of divorce after the death of the spouse who obtained it, where the bill is filed simply as a bill of review, or an application is made in the cause to open the decree. Let us suppose that the view which has been taken in some courts is correct, that after the death of the spouse who has obtained a fraudulent decree of divorce the injured spouse may, by some form of proceeding, either by a bill of review or by a petition in the cause, upon notice, of course, to the executors and heirs of the deceased spouse and all parties interested, get an order or decree opening the decree of divorce and thus establishing, in case such injured spouse is a woman, not her matrimonial status which has been destroyed by death but all her rights as widow in respect of her deceased husband's estate without, however, including as part of her relief the enforcement of any one of those rights. If that is the correct view of the power of this court in this case, the result which I have stated would not be changed. We still have in this case a bill of review, in order to secure the vacation of the fraudulent decree of divorce for the sole purpose of permitting the wife to collect her judgment without being thwarted by the statute of limitations.

This is the sole reason for bringing the suit which is set forth in the bill. Evidently, it was the theory of the framer of the

bill, indicated also by the declaration of complainant's counsel, that the court would not open this decree of divorce, with all the baleful effects of such action, upon the rights and feelings of the second wife of Mr. Givernaud and his son, if no possible benefit could thereby accrue to the complainant—benefit, I mean, in respect of a property right.

But if this statement requires qualification, it must be borne in mind that the complainant in this case does not make the absurd claim that she desires vindication from the charge that she deserted this husband whom she had cast off over forty years before she brought this suit. The bill of complaint does not set forth that the complainant has any other right in respect of property apart from her judgment, the enforcement of which is in any way affected by the decree of divorce. The sole effect of vacating the divorce would be to enable the complainant to maintain an action in some court for the recovery of this ancient judgment without meeting the bar of the statute of limitations.

But I have already found that the defence of laches would be fatal to the complainant's claim, even if the restoration of the technical status of marriage from the year 1872 until the death of Mr. Givernaud, in 1908, had the effect to relieve the complainant's case from the bar of the statute of limitations.

If the complainant set forth that Mr. Givernaud died seized of real estate and that she desired to commence actions at law or in equity, or had commenced such actions for the recovery of her dower, we should have an entirely different case, because the vacation of the decree of divorce plainly would not be futile. No defence of the statute of limitations or of laches would bar such suits for dower, and this distinction brings us to the last point which I intend to discuss.

6. I shall now assume that I am in error in supposing that a court of equity will not open this decree of divorce on behalf of Mrs. Givernaud when the sole purpose which Mrs. Givernaud discloses for procuring such judicial action is to enable her to prosecute a suit free from the bar of the statute of limitations which, on the face of her bill, is subject to a fatal defence of another kind which makes her whole claim absolutely of no value.

We come back to the proposition, which possibly the frame of the bill of complaint in this case accepted as sound, upon the strength of some authorities in other states, that where a divorce has been obtained *ex parte* by fraud the defendant, the injured spouse, may take proceedings in some appropriate manner after the death of the fraud-doer, for the sole object of having the fraudulent decree of divorce vacated so that, for all purposes as against all parties and in all courts, the marriage relation must be held to have continued unbroken by the fraudulent divorce during the joint lives of the two spouses.

I have pointed out that the pleader in this case took pains to assign a very practical reason for seeking to have the decree of divorce in this case opened, but that feature of the case I now disregard.

Adopting the widest proposition in favor of the complainant which I have heretofore rejected as unsound, it seems to me that her laches, proved beyond all doubt in this case, prevents her from obtaining any relief against this decree of divorce, although the evidence now procurable and before this court may indicate that that decree was obtained by fraud of such a character that it would have been opened during the lifetime of Mr. Besson and Mr. Givernaud if Mrs. Givernaud's application for such relief had been made earlier.

(1) Counsel for the complainant admits that the whole claim of the complainant for relief, on the theory which we are now provisionally accepting, turns on the question of notice to Mrs. Givernaud of the commencement of the divorce suit or subsequent notice of the fact that a divorce had been obtained. If Mrs. Givernaud had notice of either of these two things, it seems quite clear that she would have no standing whatever in this court at this late date to claim a vacation of the decree of divorce which she submitted to for so many years when her object now is merely to recover property.

(2) The record of the divorce suit, with the facts proved in regard to the mailing of notice to Mrs. Givernaud and the postal regulations and practices which prevailed in the city of Lyons, in 1866, when the notice was mailed, and the circumstances of Mrs. Givernaud's residence at that time in Lyons with her father,

an old citizen of the place, in my judgment, establishes a presumption that the notice of the suit was received by Mrs. Givernaud, and this presumption weighs heavily against her uncorroborated testimony after this long period of years to the effect that she did not, in fact, receive the notice which was mailed to her.

(3) If we may accept Mrs. Givernaud's uncorroborated testimony that, in fact, she did not receive the notice of the divorce suit which was mailed to her, it is still necessary that she should establish the almost incredible proposition that she did not at some time during the thirty-six years which extended from the date of the divorce until Mr. Givernaud's death—let us say prior to Mr. Besson's death—learn of facts which amounted to notice that a divorce had been obtained. I shall not undertake to set forth the testimony bearing upon this subject. Apart from Mrs. Givernaud's denial there are strong indications that she learned of facts in regard to Mr. Givernaud's second marriage which plainly indicated that he had obtained a divorce, so that if she had undertaken to make what would seem to be merely a few casual inquiries in Lyons she would have found out all about the New Jersey divorce which her husband had obtained.

(4) The evidence also strongly indicates that if Mrs. Givernaud in fact did not get notice of the divorce suit by mail or otherwise, and did not get notice of the fact that a decree of divorce had been obtained by her husband, it was due to her resolution to ignore her husband and to disregard any possible legal existence of the marriage bond which she had sundered as far as the law of her country would permit. Mrs. Givernaud's own testimony shows what her state of mind was, and the proofs disclose the natural reasons for that state of mind. It is difficult to believe that if Mrs. Givernaud received notice of the institution of the suit for divorce, she would have taken the trouble to send her decree for the separation of her person to America in order to defeat Mr. Givernaud's suit, although she alleges in her bill and testifies that she would have taken this course.

However this may be, the evidence shows that if Mrs. Givernaud did not get actual notice of the divorce suit or the divorce decree, it was because she did not care to learn anything about

these things or about any other things pertaining to the life in America of her husband whom she despised and had cast off as far as was possible under the law of her country. I know of no principle of equity or of ethics which aids this lady who, for thirty-six years, repudiated her husband and renounced the marriage relation, in now promptly after his death obtaining a vacation of the decree of divorce for the sole purpose of getting some of the pecuniary benefits of the marriage which she had repudiated as long as the maintenance of any marriage with her husband was possible.

(5) There is another very strong reason for the exercise of the greatest possible caution on the part of this court before opening this ancient decree of divorce arising from the fact that such action would bastardize Mr. Givernaud's adult son by his second marriage, now a married man of thirty-seven years of age, one of the defendants in this suit, and as such bound by any decree to be made herein, and also stigmatize the relations of Mr. Givernaud with his second wife, who presumably relied innocently upon this divorce which was absolutely valid on its face during the long years that the couple lived together, as not marital but meretricious.

To allow the complainant on the strength of her uncorroborated oath to an improbable story after thirty-eight years to open a decree of divorce, regularly obtained, after these witnesses to the transaction which she impeaches are dead, and thereby bastardize the issue of the marriage which followed the divorce and presumably was entered into in good faith by the second wife, all for the sake of enabling the complainant to obtain money or other property as the widow of a man to whom during his long life she refused to be a wife, would, in my judgment, be a travesty of justice.