IDA MAY DENNIS, Appellant, v. EMMA J. HARRIS, Administratrix, et al., Appellees.

DIVORCE: Decree—Annulment—Duress—Test to Determine. Duress
1  may be sufficient to annul and set aside a decree of divorce on application of the one in whose favor the decree was entered. Just how far such duress must be carried in order to justify such annulment, the law cannot fix with absolute precision. The test is: Was the person so acted upon by threats and the like that, in what he did, he was bereft of the quality of mind essential to voluntary action? Evidence reviewed, and held to show that the wife, in bringing an action for divorce, was forced into so doing by the duress of the husband, and that the decree entered therein should be set aside.

DIVORCE: Decree Obtained by Duress—Protection of Property Interests—Annulment After Death. A decree of divorce, entered in
2  an action involuntarily brought by the plaintiff therein because of the duress of the other spouse, may, in order to protect property rights and defeat the fraud, be set aside, on application of the plaintiff in whose favor the decree was entered, even though the guilty spouse be dead.

DIVORCE: Decree—Action to Annul—Laches. Laches, sufficient to
3  preclude the right to annul and set aside a fraudulent decree of divorce, cannot be predicated on a delay working no disadvantage to anyone.

PRINCIPLE APPLIED: A wife was coerced into bringing an action for divorce, and was granted a decree. The husband did not remarry, and died six months later. Five months after the death of the husband, the wife brought an action to annul and set aside the decree of divorce. After the divorce, the former husband and wife maintained friendly relations. He finally returned to the home of the wife, and she cared for him until his death, a few days later. *Held*, there was no such delay as to justify a denial of relief.

**DIVORCE:** Decree—Action to Annul—Retention of Alimony—Es-
4 **toppel.** Retention of alimony does not work an estoppel to set aside a divorce decree on the ground of fraud, when the record showed: (a) That if the decree was not set aside, the plaintiff would still be entitled to retain the alimony, and (b) that, if the decree was set aside, the plaintiff's share of her husband's property would be in excess of the alimony retained, the plaintiff in her application to have the decree set aside consenting that, in case it was set aside, she be charged with the amount of alimony retained.

*Appeal from Montgomery District Court.*—E. B. Woodruff, Judge.

Wednesday, June 30, 1915.

Rehearing Denied, Monday, January 22, 1917.

Suit to set aside a decree of divorce and for allowance of a distributive share of the property of deceased party, and, if not set aside, for additional alimony. On hearing, the petition was dismissed. The plaintiff appeals.—*Reversed.*

*Tinley, Mitchell & Pryor, T. J. Hysham* and *Paul W. Richards,* for appellant.

*J. M. Junkin, Ralph Pringle, John P. Organ* and *John M. Galvin,* for appellees.

**1. DIVORCE: decree: annulment: duress: test to determine.**

Ladd, J.—I. The plaintiff was married to Ernest G. Dennis in May, 1900. They lived together until sometime in the fall of 1911, though he was absent much of the time during the last year. A petition praying for divorce

was filed by her on October 6th of that year, and a decree entered on October 18th, following. Under stipulation, she was paid $15,300 as permanent alimony. He paid all expenses, including the fees of her attorneys. He died April 21, 1912, without having married again, and in this action she alleged: (1) That, in obtaining the decree of divorce, she was coerced to do so against her will and by threats of violence on her person, the taking of her life, and that she would be deprived of her interest as a wife in his property and be left penniless, when, but for this, she would not have instituted or prosecuted the suit; and (2) that he was owner of property of the value of $90,000, but fraudulently induced her to believe that he was largely indebted, and that the proceeds of the sale of a tract of land amounting to $46,000 were necessary to discharge his indebtedness, and thereby he fraudulently induced her to accept an amount as alimony much less than she would have been entitled to but for such deception; and the prayer was that the decree of divorce be set aside and that she be adjudged entitled to the same portion of the estate of the deceased as she would have been entitled to were she his widow (the amount of alimony received to be taken into consideration), and, if this relief should not be awarded, that such additional amount as should be deemed equitable be allowed to her as alimony.

The defendants are the heirs of the deceased. The evidence leaves no doubt that he had violated his marital obligations in many respects, and that she was entitled to a divorce on the grounds of: (1) adultery; (2) habitual drunkenness, unless he had been the same at the time of their marriage; and (3) cruel and inhuman treatment. The latter only was alleged as a ground for divorce, without any specifications of facts. That these grounds existed, and that she had consulted a reputable attorney, R. W. Beeson, concerning the conduct of her husband with reference to

the procurement of a divorce, tends to support the theory of defendants that, in bringing the suit, she acted volun- tarily. Though consulting Beeson several times, however, she declined to sign a petition for divorce which had been prepared in event she wished to proceed, and the entire matter appears to have been dropped sometime in 1910,— she says prior to July, while Beeson is unable to recall the time, saying that he might have been consulted by her as late as 1911, though he is not positive. The circum- stance that she gave up getting a divorce through Beeson strongly confirms her claim that she so did because of her affection for her husband. Beeson testified that "from her talk it seemed she was attached to her husband; she was not able to make up her mind to get a divorce." Her claim that she was afraid of her husband also finds corroboration in Beeson's statement that he "soon discovered that Mrs. Dennis was afraid of Mr. Dennis."

The record leaves little or no doubt that she then abandoned the notion of separation, and it is equally con- clusive that the husband subsequently, and owing to his undue intimacy with a young woman named Totenhagen, planned the separation from his wife which subsequently occurred.

As we reach the conclusion that she acted under duress in obtaining the decree of divorce, it is unnecessary to review the evidence bearing on the deceit alleged as induc- ing her to accept a smaller amount as alimony than other- wise she would have. It may as well be said, however, that such deceit was fully proven. What constitutes duress in such a case depends largely on circumstances. The law rec- ognizes the dominance ordinarily exerted by the husband over his wife. Thus, a prima-facie case of coercion, such as to relieve a married woman from liability for her criminal act, is made out when it appears to have been committed in the presence of her husband. *State v. Fitzgerald*, 49

Iowa 260. To hold her therefor, his presumed influence over her must be overcome by evidence showing that the act on her part was voluntary. *State v. Kelly,* 74 Iowa 589. In *Callendar Sav. Bank v. Loos,* 142 Iowa 1, what duress means at common law is pointed out, and it is said, in quoting with approval from a Minnesota case:

"Modern authorities generally hold that such pressure or constraint as compels a man to go against his will, and virtually takes away his free agency, and destroys the power of refusing to comply with the unlawful demand of another, will constitute duress, irrespective of the manifestation or apprehension of physical force."

In *Phillips v. Chase,* 203 Mass. 556 (30 L. R. A. [N. S.] 159), Chase, a physician, was called to treat a divorced woman, and upon her recovery married her. She was sensitive over the matter of her first marriage, and, possessing much property, he insisted that she adopt his son by his first marriage. At first she refused; but finally, when he threatened that "if you do not adopt my son I will leave you and will not live with you as husband," she yielded, and, as required by the statute of Massachusetts, filed a petition alleging that it was her voluntary act and desire to adopt the son as her own, and verified said petition. Shortly afterwards she died, and later the son, leaving Chase his sole heir. Her heirs instituted suit against Chase to set aside the adoption on the ground of the latter's fraud. In holding that the showing of duress was sufficient, the court said:

"We are of opinion that if one so dominates his wife's will as to force her against her will to bring a petition in court for the adoption by her of his son by a former wife, he commits a gross fraud upon his wife and such a fraud upon the court that the decree of adoption should be set aside in a proper case. For that proposition no authorities are necessary."

The rule undoubtedly is as stated.   If it must be said from the evidence that the plaintiff, in prosecuting the suit for divorce and procuring the decree, did not do so voluntarily, but therein was dominated and controlled by her husband and required so to do against her will, when but for such coercion she would not have done so, the allegation of duress has been established.   In other words, the duress need not be of any specified kind; it is enough if the means resorted to, tending to coerce another, actually induces that other to do the act contrary to her own will. There is no legal standard of resistance which the person acted upon must come up to at his peril of being remediless for the wrong done to him, and no general rule as to the sufficiency of the facts to produce duress.   The inquiry in each case is, Was the person so acted upon by threats and the like that in what he did he was bereft of the quality of mind essential to voluntary action?   The deceased was a powerful and determined man, addicted to the excessive use of intoxicating liquors, and, aside from being infatuated with a young woman who had been employed at his home, was given to indulgence in debaucheries at Omaha, where he seems to have spent most of his time when not sobering up at home.   He was maintaining the young woman at school, and was shown to have been strongly impressed with the notion that he should become her husband. There may be no direct evidence of coercion, as is contended, for probably this would not have been exerted when others were present; and, as Section 4604 of the Code rendered plaintiff incompetent to testify as a witness to any transactions or conversations between herself and the deceased, she necessarily is compelled to rely upon circumstances and statements made by him to others indicating his purposes and disclosing what he had done in the way of compelling her to carry out his designs.

He employed attorneys to act for her in suing him for a

divorce, and, long before suit was begun, agreed to pay them for their services, and at the same time stipulated to meet all costs and expenses. Moreover, he dictated the ground to be alleged on which the decree should be obtained. The plaintiff had no conversation with the attorneys concerning their employment or the facts to be alleged in the petition; and, although one of them may have considered himself as appearing for her, he was acting under the employment of her adversary in the suit he was prosecuting. This appears from a stipulation which her husband procured to be drawn after misrepresenting to her his indebtedness and after repeated violence against her person.

He called on W. J. Roberts, assistant cashier of the First National Bank of Red Oak, with a memorandum which he had written as follows:

"I give to my wife, Mrs. E. G. Dennis, $15,200. Pay all expenses in getting a *divorse,* give $100, as soon as contract is signed, house expense, dining room table, sideboard, all of the furniture we * * * mother's desk * * * stand, etc., all of the dishes except some few which I reserve, choice of bed and bedding."

There was some additional matter which had become illegible. He said to Roberts, according to the latter's testimony, "May and I have agreed to disagree," and, upon Roberts' expressing regret, responded, "Bill, you don't know what a load I am carrying." He then requested Roberts to prepare a contract from the memoranda, and after some parley, Roberts suggested that he go to his regular attorneys, and he proceeded to the office of Ralph Pringle, who, at his request, prepared the following:

"Agreement for Alimony.

"Whereas, Ida May Dennis is beginning action for divorce from her husband, E. G. Dennis, and said parties have agreed upon the alimony to be granted said Ida May Den-

nis in the event divorce is decreed between said parties, it is hereby stipulated between said parties that, if said divorce is granted and immediately upon the decree being entered, said E. G. Dennis shall pay to said Ida May Dennis in cash the sum of $15,200. He shall also pay all expenses connected with the securing of said divorce, including court costs and attorney fee for Ralph Pringle as attorney for said Ida May Dennis, plaintiff in said action. Said E. G. Dennis also agrees to give to said Ida May Dennis all the rugs in their residence except one small rug already selected by E. G. Dennis. He also agrees to give her the hall tree, the dining room table, the sideboard, all the furniture owned by either or both parties prior to the death of Jane Dennis, the parlor stand, all the dishes, except some reserved by E. G. Dennis which have been agreed upon, and one bed and bedding to be selected by Ida May Dennis. It is further agreed that E. G. Dennis shall immediately and now pay to Ida May Dennis the sum of $100, and to bear all the usual and ordinary expenses of said Ida May Dennis until the granting of said divorce. It is further understood that application for divorce is to be made upon the grounds of cruel and inhuman treatment; that Ida May Dennis is to be the plaintiff in said suit.

"E. G. Dennis,

"Mrs. Ida May Dennis."

At that time, Pringle had never talked with Mrs. Dennis concerning any disagreement with her husband or the procurement of a divorce. The deceased then took the agreement back to Roberts and requested him to go home with him to witness its signature, and this was done. Roberts thus relates what occurred:

"Mrs. Dennis came into the room, east of the parlor; she was in tears, and in a kimono, and she was on a lounge there, and I think Dennis opened up the conversation by

saying that he had this matter fixed up now and had brought me up to explain it, to read it to her; so she continued to cry and for several minutes, and I thought apparently she could not pull herself together, control her tears; and in the meantime Dennis was nervous, and he commenced to walk from one room into the other, and says: 'Well, are you going to sign it?' She burst into tears again, and he says, 'Well, we have got no time to stay up here;' and Mrs. Dennis continued to cry, and she said: 'Well, Ernie, you see this is all your doings, not mine.' Q. What did Mr. Dennis say, if anything, to that? A. 'Why,' he says, 'that is the way we have got it fixed up now; I think after it's all over you will feel better over it, and probably I will.' After Mrs. Dennis signed it we left immediately. We met Mrs. Fry soon after we left the house."

Mrs. Fry testified that:

"As I came to the house I heard Mrs. Dennis screaming. I went round to the side door and went in  *  *  * Mrs. Dennis came to me and threw her arms around me. *  *  *  She was nervous and excited and could hardly talk; her eyes were all swollen and water was running⁊ down her eyes. I never seen her in such condition."

What plaintiff then said is omitted as not admissible. John Farlin, who acted as agent in procuring a purchaser for the land sold, testified that, in the course of a conversation with him, deceased had said that he "expected to have his wife get a divorce if he could;" that "he had some trouble with another woman and wanted to get rid of this one as soon as possible;" that "he wanted to get rid of this land, turn it into money so he could get a settlement with his wife as cheap as he could."

Mrs. Hurlburt, a cousin of plaintiff's, testified that, when she and the plaintiff called on the attorney Pringle, plaintiff informed him that, if she was put upon the witness stand to tell the truth, she would have to swear "that

this was a forced case all the way through;" and that the attorney made no answer. Pringle denied this, and swore that, although she said she was compelled to sue for a divorce, this was for her own protection; and that the deceased at one time wanted to call the matter off and go back home, but she responded that it had gone too far now. A sister of the plaintiff's testified that, the night before the trial of the divorce case, she was at the Dennis home and that Dennis came, and, as he stepped in, "threw his arms around the plaintiff and embraced and kissed her and they both cried, and he said, 'May, I have come home to stay with you now always, and to make things right with you,'" to which Mrs. Dennis responded, "You cannot do that too quick to suit me;" that he said, "May, I am sick, put me to bed and we will see about this tomorrow;" that she returned the next day as plaintiff was preparing to go to the court room; that she (plaintiff) kneeled by the side of the bed and put her arms around him and said, "Ernie, do you intend to do today what you said you would do—make this right and have Mr. Pringle come and fix things all right;" and that he responded, "No, it has gone too damned far now;" that he added, "Cut out the G—— d—— talk around here—go get your things and go to the court room, I will be there;" that shortly after the trial they met in the hall, when he put his arm about her and they cried, and she said, "Ernie, this is your fault and not mine."

This testimony was corroborated by that of Lizzie Brown. Mrs. Pratt testified that plaintiff telephoned to Pringle about Dennis' promise, and asked him if he would come up to the house and see him about it. Pringle had no recollection of a talk with Mrs. Pratt, but did not deny having this one with plaintiff, and he did call on deceased, who also was present. The witness Lizzie Brown testified that, at one time when passing the farm where they had

lived when first married, he said, "May, do you suppose you will live on that farm again?" and she responded, "I will never give up hopes."

One Everhard, a colored man, testified that the correspondence with the Totenhagen girl was through him, and that the deceased explained to him how he proposed to obtain a divorce from his wife and marry the girl, saying that he could make her do anything he wished, and could compel her to get a divorce; and that "he had gotten her (his wife) to a place where he could make her settle anyway he wanted to." Shapcott swore that he had said to deceased at one time that he had heard he was going to get a divorce, and asked how he was going to do it, to which deceased responded, "I will make her do it. Damn her, I will make her get one." This was in the latter part of August, 1911. One Dillon testified that Dennis had said to him that he intended to leave his property to May and his nephew Kirk; that "his wife had been mistreated, had not been treated right, and as long as he lived he would take care of her."

According to Fry, he told him that "he was going to get a divorce from his wife and was going to sell it (his property) and turn it into cash and go away from here to live." Said he would make her do anything he wanted her to do. He said that he would not give her any more than he had to give her. That at another time he said "she would sign it (the deed) or he would knock her G—— d—— head off." To Merritt he spoke of "forcing his wife to get a divorce; said he would make things so unpleasant for her that she would be compelled to get a divorce, and failing in that he would make her do it—force her to do it," and remarked, "He would knock her damned block off if she didn't get a divorce." This witness also relates a conversation at the dinner table where the matter of obtaining a divorce to enable him to marry the Totenhagen girl

was discussed. The plaintiff testified that she informed her lawyer that her husband, rather than she, ought to sign the petition; that it was "the hardest day's work I ever did in my life." She testified further that she never discussed with her attorneys the amount of property her husband had or the amount of alimony to be allowed.

Whatever she may have related as to transactions or conversations with deceased, and also what she may have said to witnesses giving accounts of conversations, is omitted as not admissible. Nor have we thought it necessary to recite the facts concerning his repeated acts of cruelty to his wife in the meantime, his repeated debauches in Omaha or elsewhere, and the care bestowed on him when sobering up. On the other hand, Pringle, who was employed by the deceased to sue him for a divorce in behalf of his wife, the plaintiff, and consistently now is one of the attorneys for defendants, admitted that he did not learn of the contemplated divorce until the day the agreement was drawn; and testified that Dennis had told him that Mrs. Dennis wished him to act as her attorney because of being better acquainted with him than with any other attorney; that subsequently Mrs. Dennis called at his office to inquire what further was necessary to be done "about the divorce that she was securing from her husband; that she expressed regret, but said that Ernie had been getting worse in his habits; that he was now drinking a great deal of the time and away from home; that about the only time he spent at home was to sober up from his drunkenness; and when he was sober and all right .would usually leave and be gone, and come home again, and she had to take care of him and sober him up; that he mistreated her by striking her and had bruised her body and face and spent a great deal of money; that she could not stand it any longer to be Ernie Dennis' wife while he was living with another woman; that he was drunk so much and spent so much

money he was unfit for business; that it seemed to her that if she did not get a part of the property now it would not be long until they might not have a great deal left. * * * She seemed to feel bad about his conduct toward her." The witness testified further that she called a few days later and discussed the propriety of accepting a note and mortgage for the alimony instead of cash, and also inquired what she should do if her husband returned, and he advised her it would look strange for them to be living in the same house when procuring a divorce; that she remarked that, "if he comes back here, he will certainly come to the house," when he inquired, "Do you want to stay?" She answered, "No, I don't." That she again consulted him about taking the homestead as a part of her alimony, and inquired if Dennis would be back at the opening of court, and what witnesses would be required, and the questions to be asked and the testimony was talked over; and that "Mrs. Dennis said she did not like the divorce proceedings, but, under the circumstances, and in view of what Ernie Dennis was doing, she could stand it no longer to be his wife—he living with another woman—and that she would get a divorce and get some money while there was some money to get. * * * She said that he had promised her many times to do better. Had broken his promise."

The late J. M. Junkin also acted as attorney for Mrs. Dennis. He testified to having had two conversations with her, one in consulting her about taking a mortgage instead of cash as alimony, and the other shortly before the decree of divorce was entered; that in the latter, she inquired if the trial of the divorce suit might proceed without Dennis, and he explained that it could not, for the reason that the evidence would be introduced and the court requested not to enter a decree until she was paid the money as alimony; that she had been in the office at least a dozen times, and that at no time did she say or intimate that there was any

compulsion in the matter; and, further, that, after the evi-
had been introduced and before the alimony was paid, Den-
nis said to his wife, "May, let's call this thing off, we can
get along." She shook her head, indicating "No," and says,
"Ernie, it has gone too far." The money was then paid.

But the clerk of the court testified that he was present,
and heard no statements such as the last related by Pringle
and Junkin; and the plaintiff's sister, as well as plaintiff
herself, denied that anything of the kind occurred. More-
over, both relate that they met deceased in the hall just
before, when plaintiff declared, all being in tears, that it
was all his fault.

The conversation of Sain and his daughter Mrs. Harp
related to a talk by plaintiff with reference to a divorce
in 1910, as did much of that to Miss Fisher and Mr. and Mrs.
Harris. However, Mrs. Harris related a conversation alleged
to have occurred in 1911, when the plaintiff is said to have
insisted that she was going to get a divorce, for that she
could stand it no longer, and also declared that she had not
earned any of the money in her husband's name, and was
not getting one third, but probably all she could acquire
in court. The husband of Mrs. Harris testified to substan-
tially the same; but the plaintiff denied the alleged conver-
sation with these witnesses, as she did that with Miss
Fisher. As the plaintiff was aware that the attorneys had
been employed by her husband, she might well have talked
in harmony with the plan laid out by him. All she said con-
cerning his misconduct finds ample proof in the record, and
all these attorneys testify to, inconsistent with her conten-
tion that she was being coerced by her husband, was saying,
in substance, that she would endure it no longer.

The record as a whole leaves no doubt that the plaintiff
was burdened by the situation, and felt outraged by the
conduct of her husband with the Totenhagen girl, as well
as by his repeated debauches at Omaha and his conduct

at home, where he remained only long enough to be nursed back by her to sobriety, only to further indulge his appetites and passions. It was but natural that she should talk to her acquaintances and neighbors of her situation, and through what course she might relieve herself from the conditions which surrounded her. But talking of final separation from her husband and actually proceeding to obtain such separation through a decree of divorce were quite different matters. The outcome of her consultation with Beeson demonstrated that, when put to the test, she was adverse to parting from her husband, and the record teems with circumstances indicating her affection for the deceased, notwithstanding her conversations with others, and no one can read it through without being abidingly convinced that, in order to induce her to procure a divorce, he treated her with gross cruelty, indecency and neglect, and that, but for his influence over her will, she would have borne all and never have authorized an attorney to prepare a petition, nor have applied to the court for separation.

We have not attempted to recite all the evidence; only enough has been set out to indicate the course pursued in reaching our conclusion. Every circumstance is in accord therewith. His employment of counsel to act ostensibly for her; his repeated manifestations of personal violence toward her; his misrepresentations as to the net value of his property; his statements to others of what he proposed to do and had done; his situation with respect to the Totenhagen woman; plaintiff's conduct with reference to signing the stipulation and the conditions of that instrument,—all point to the fact that he was bent on casting her off for another, and that, in order to accomplish this, he coerced her into procuring a decree of divorce from him. Their subsequent relations strongly confirm this view, for he loaned out for her the money paid as alimony. They often met, and each partially arranged to remember the other by

will, she to leave the entire remainder in her property to him, and he, one half or one fourth of all he had to her; and finally he returned to her sick, never again to leave, and died in her arms. Surely a woman who thus loved ought not be found, on a record such as that before us, to have voluntarily demanded a decree of divorcement. She was the instrument of his will in obtaining the decree. She was forced to procure it, and that decree should be set aside and held for naught.

II. We are next confronted with the proposition that, as death has dissolved the marital relation existing between the deceased and the plaintiff, no inquiry into the validity of the decree is permissible; that, as the status of the parties has been fixed, and as plaintiff was not the spouse of deceased at the time of his death, she is not in situation to claim or take a wife's dower interest in his estate. In other words, it is contended by the appellee that, as there was a decree of divorce, no matter how obtained, it may not be disturbed, as the status of the party is finally determined, even though property rights may depend thereon, and be found to have been fixed by fraud practiced on the plaintiff.

2. DIVORCE: decree obtained by duress: protection of property interests: annulment after death.

There is no doubt that some courts have treated decrees of divorce with the consideration contended for, and have held that a decree, though the product of the grossest fraud, may be effectual in depriving a wronged spouse of the property rights incident to the marriage relation. *Givernaud v. Givernaud,* (N. J.) 85 Atl. 830; *Bay v. Bay,* (Ohio) 98 N. E. 109; *Dwyer v. Nolan,* 40 Wash. 459 (1 L. R. A. [N. S.] 551, and note; 111 Am. St. 919); *Lieber v. Lieber,* (Mo.) 143 S. W. 458. But the clear weight of authority is the other way. True, to entitle the wife to a dower or distributive share, there must have been marriage, seisin, and death of the husband. During marriage, the right of the wife in the

property of her husband is inchoate, but is of value which the courts will protect. *Buzick v. Buzick,* 44 Iowa 259. On his death, it becomes perfect, unless she has, voluntarily or otherwise, parted with or forfeited it. To give her this right, however, the marriage must have continued until the time of death; or, if not so continuing, must have been terminated without her fault or in a manner rendering it invalid as against the wife. A decree of divorce, unassailed, is a complete bar to any claim to dower.

In *McCraney v. McCraney,* 5 Iowa 232, the complainant sought to have the decree of divorce set aside so far as to give her the dower interest and a distributive share of one third in the personal estate of her deceased husband, on the ground that the decree of divorce was obtained by fraud; and the court held that, as the petition did not pray that the decree of divorce be set aside, the relief could not be granted, for that it would be inconsistent to award dower and yet allow the decree to stand. At a prior term, an opinion had been delivered by the majority of the court granting the relief prayed, but on rehearing the opinion was withdrawn, probably in view of the possibility of reaching a unanimous decision on the point above stated. Whether such a decree might be set aside was left an open question. This point was raised in *Lawrence v. Nelson,* 113 Iowa 277, where, owing to fraud in the matter of jurisdiction, a decree of divorce was set aside after the death of the successful party, and the former wife of the deceased pensioner held entitled to claim a pension under the laws of the United States. A valuable note gathering all the cases bearing on the point will be found in connection with this case, reported in 57 L. R. A. 583. The same question came before the court in *Wood v. Wood,* 136 Iowa 128, and this case also will be found reported, with valuable note added, in 125 Am. St. Rep. 230. See, also, 12 L. R. A. (N. S.) 891. See, also, *Whitcomb v. Whitcomb,* 46 Iowa 437; *Clay*

*v. Robertson,* (Okla.) 120 Pac. 1102; *Day v. Nottingham,* (Ind.) 66 N. E. 998.

Mr. Freeman, by way of introduction, in the note in 125 Am. St. Rep. 230, observes:

"The right to contest the validity of a decree in divorce after the death of one of the parties thereto has not been very often before the courts, especially where any contention was raised by counsel as to the effect of such death upon the right of the complaining party to have the decree reviewed; and in the absence of any such contention, and where property rights were involved, the courts seem generally not to have considered the fact that one of the parties was dead as having any important bearing in the right of the complainant to obtain relief, but to have decided the cases upon the same general principles as those involved in an attack upon any other final judgment in a civil action. It is, of course, recognized in all the cases, that death ends the marriage relation, and therefore terminates a suit which has no purpose except to accomplish that end (*actio personalis moritur cum persona*); but according to the decided weight of authority, as we shall see, when property rights are involved, a decree in divorce, like any other final judgment, may be vacated or set aside when obtained by fraud, notwithstanding the death of one of the parties thereto. The right of attack in such cases is not permitted for the purpose of continuing the controversy touching the right of divorce within itself, but for the ascertainment of the correctness of the decree with relation to such property rights. There are a few exceptions to this rule which will be duly noted."

In *Wood v. Wood,* supra, both parties were dead, and it was conceded that their status while living was no longer a proper subject of judicial inquiry, save as this might affect property rights of those entitled thereto, and it was held that, to protect such property rights, the decree of di-

vorce might be set aside. The pioneer case on the subject appears to have been *Johnson v. Coleman,* 23 Wis. 452 (99 Am. Dec. 193). The widow brought an action in the nature of a bill of review against the personal representatives of her deceased husband and his heirs at law to have the decree of divorce declared void, upon the ground that it was obtained by fraud, and it was held that the petition alleged extrinsic facts *dehors* the record, which, if proven, would show that the decree was entered without jurisdiction and through fraud, and relief sought might be granted.

In *Brown v. Grove,* 116 Ind. 84 (9 Am. St. 823), the husband had procured the petition for divorce to be filed in the name of his wife, and then answered the complainant, the wife being without knowledge of the proceeding for more than 20 years after the decree was granted, and it was held that this amounted to a fraud on the court, and that she was entitled to have the decree annulled, although long after the husband's death. See, also, *Willman v. Willman,* 57 Ind. 500.

In *Bomsta v. Johnson,* 38 Minn. 230 (36 N. W. 341), the authority of the court to set aside decrees of divorce upon the ground of having been obtained by fraud, was fully recognized. To the same effect, see *Rawlins v. Rawlins,* 18 Fla. 345; *Rodgers v. Nichols,* 15 Okla. 579 (83 Pac. 923). In the last case, the court observed:

"The doctrine that, subsequent to the death of the party who obtained a decree of divorce by fraud, an action will lie to annul the same, is sustained by all the authorities."

In 2 Nelson on Divorce and Separation, Section 1054, the author says:

"A decree obtained by fraud will be vacated, although one of the divorced parties is dead. The same rule of public policy that requires the decree to be vacated, although a second marriage has taken place, will require the same relief, although one of the parties is dead. The proceeding will be

a mere contest for property; for, if the decree is vacated, the survivor cannot be restored to marital rights. The fact that the party is dead, who is alleged to have procured the decree by fraud, should justify the court in requiring clear and satisfactory evidence of the fraud, for the dead can make no denials or explanations."

In *Leathers v. Stewart*, 108 Maine 96 (Ann. Cas. 1913 B, 366), the principle is recognized, and a decree of divorce on its face valid was set aside because of the affidavit that the residence of the wife was unknown to the husband suing for a divorce, and could not be ascertained, when in fact it might readily have been discovered. In the note attached to this case, the annotator observes:

"While it is a general rule that after the death of a party his status while living is no longer a proper subject of judicial inquiry, save as it may affect the property rights of his survivors or heirs, the view generally obtaining in reference to the power of the court to set aside or vacate a divorce decree, in a direct proceeding instituted after the death of one of the parties by the survivor, is that if the property interests of such survivor are affected by the decree, the decree itself may be assailed, if it is for any reason void or voidable."

The question, however, is not an open one in this court, having been determined in the two cases cited in accordance with the contention of appellant. If the rule were otherwise than held therein, the ancient boast of "no wrong without a remedy" would be groundless, and though a wife were coerced or deceived into the procurement of a decree of divorce and promptly repudiated the fraud, yet if her husband died before this were done, by a suit brought to set aside the decree, she would be without remedy, and might not even be recouped the financial loss consequent on the fraud. True, alimony might be claimed, but that is never awarded as a matter of compensation, and, even if

it were, would not be adequate. In such a case, the decree is not set aside as affecting status after death, but by way of undoing what was fraudulently accomplished, as affecting the property rights which would have matured but for the influence of the fraud exerted by the deceased. Had the latter survived, the status would have been restored by setting aside the decree upon finding that it was fraudulently obtained. And, even though the husband had departed this life an instant later, the surviving wife would have taken a distributive share in his estate. Should his death a few days sooner, without fault on her part, deprive her utterly of property rights to which she would have been entitled had he lived these few days longer? Should a mere decree spread upon the record, the product of fraud, be permitted to deprive her of an adequate remedy? Surely not, when, by setting the decree aside and adjudging it to be as of naught, because of having been procured by duress and fraud, the wife may be accorded mutual justice by awarding her the precise portion of the deceased's property she would have taken but for the indirection of the deceased. We are of opinion, regardless of what the relief may be denominated, that, upon proof that a decree of divorce has been obtained by fraud or duress, it may be set aside even after the death of the perpetrator of such fraud, and the relief awarded sufficient to compensate the financial loss consequent upon the wrong perpetrated.

It is contended that plaintiff was guilty

**3. DIVORCE: decree: action to annul: laches.** of laches, and for that reason ought not to be permitted to maintain the action. The husband died April 21, 1912, and suit was begun September 30th, following. This certainly cannot be regarded as an unreasonable delay. The decree of divorce had been entered October 18, 1911, six months and three days prior to his death. There is every reason for prompt action in repudiating fraud practiced in such a case, unless the party shall

elect to acquiesce in the result. The determination as to whether the delay has been such as to indicate such acquiescence, necessarily depends upon the circumstances and the situation of the parties. As observed in *Leathers v. Stewart*, 108 Maine 96 (Ann. Cas. 1913 B, 366):

"Laches is negligence or omission seasonably to assert a right. It exists when the omission to assert the right has continued for an unreasonable and unexplained lapse of time, and under circumstances where the delay has been prejudicial to an adverse party, and when it would be inequitable to enforce the right. The circumstances in a given case which are claimed to constitute laches are, of course, questions of fact. But the conclusion whether, upon the facts, it would be inequitable to enforce the right, and whether the claimant is barred by laches, involves a question of law."

Mr. Pomeroy in his work on Equitable Remedies, Volume 1, Section 21, says that the true doctrine concerning laches has never been more concisely and accurately stated than in the following language employed by the Supreme Court of Rhode Island:

"Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as the parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of the right." *Chase v. Chase*, 20 R. I. 202 (37 Atl. 804).

Though the motive of deceased in obtaining the decree of divorce was to enable him to marry another, he had not done so. He had continued to drink excessively, but he

had not abandoned friendly relations with the plaintiff. He loaned out for her the amount paid her as alimony. They talked over provisions to be inserted in her will, leaving everything to him after a life estate in her mother, and he is shown to have expressed the purpose of willing to her one fourth of his property at least. He returned to her shortly before his death, with announcement that he had come nevermore to leave, was cared for, and died in her arms. In these circumstances, she would not be likely to hasten in instituting suit, and, as no one has been prejudiced by the delay, the doctrine of laches ought not to be applied. We have discovered no decision denying relief, where the delay in instituting suit was so brief. *Horton v. Stegmyer*, 175 Fed. 756 (20 Ann. Cas. 1134) ; *McElrath v. McElrath*, 120 Minn. 380 (44 L. R. A. [N. S.] 505) ; *Nicholson v. Nicholson*, (Ind.) 15 N. E. 223; *Lieber v. Lieber*, 239 Mo. 1 (143 S. W. 458). See, contra, *Chatterton v. Chatterton*, 231 Ill. 449 (121 Am. St. Rep. 339).

The action was timely, and the plea of laches should be disregarded.

III. It is argued that, as the plaintiff

**4. DIVORCE: decree: action to annul: retention of alimony: estoppel.** has accepted benefit by way of alimony under the decree of divorce, she is estopped from questioning the same for the purpose of establishing right to his property. See *Marvin v. Foster*, (Minn.) 63 N. W. 484. She offered in the petition, however, to have the amount paid her as alimony considered in ascertaining the share of property which may be awarded her in event the decree shall be set aside, and as, in that event, she would be entitled to much more, there was no occasion to return such property. If, however, that relief should not be accorded, she would be entitled to retain what she had received as alimony. In these circumstances, as she would be entitled to all she received under the decree of divorce, she is not estopped by reason of the receipt or

retention of the money. The decree of divorce should have been set aside, and the plaintiff decreed entitled to the share of the estate (including the amount paid as alimony) which she would have taken as widow but for the divorce, less the amount so paid her.—*Reversed.*

Gaynor, C. J., Weaver and Salinger, JJ., concur.