IN RE ESTATE OF A. LUCILE GREEN.

LEE O. FILES, Appellant, v. GEORGE A. GREEN et al., Administrators, Appellees.

**DESCENT AND DISTRIBUTION:** Persons Entitled—Parents—Denial of Paternity. Repeated denials by a father during the lifetime of his intestate daughter that he was her father will not equitably

estop him from claiming his inheritance from her estate, it appearing that no one had legally changed his position by reason of such denials.

*Appeal from Johnson District Court.*—RALPH OTTO, Judge.

FEBRUARY 5, 1924.

REHEARING DENIED MAY 10, 1924.

ACTION in probate, to remove an administrator and to adjudicate the right of the father to inherit the estate of his intestate daughter. Order in the court below removing appellant as administrator, and judgment holding that he, by his conduct, has estopped himself from asserting any claim to the estate of the intestate. He appeals.—*Reversed.*

*A. E. Maine,* for appellant.

*Henry G. Walker,* for appellees.

STEVENS, J.—The appellant, Lee O. Files, and Mary Green were married April 5, 1906, at Marion, Iowa. They resided together at the home of the husband's parents for a few weeks, when they separated, and never thereafter appear to have in any way recognized each other. The wife was taken to her parental home by her father at her request. On October 8, 1906, she gave birth to a child, known in the record as A. Lucile Green and A. Lucile Green Files. Mary Files died July 11, 1908, of tuberculosis. A. Lucile Green Files died intestate, April 21, 1922. On May 8th, George A. and Clarence C. Green, appellees and uncles of intestate, filed an application in the probate court, asking that they be appointed administrators of said estate, and on the same day administration was granted to them. On May 9th, the appellant, Lee O. Files, upon his own application, was also appointed administrator of the estate. On May 10th, appellant filed an application to set aside the appointment of George A. and Clarence C. Green as administrators. Later, George A. and Clarence C. Green filed answer to the application of appellant for their removal as administrators, setting up that, by his

conduct, he had estopped himself from asserting any claim as heir at law to the estate of Lucile. The several applications and all the issues joined thereon were consolidated and tried together.

Appellees' plea of estoppel is based upon the alleged denial of appellant of the paternity of deceased and his conduct and attitude toward her, which they allege deceived and misled her grandfather, John W. Green, from whom she inherited her estate, into believing that appellant would stand upon his denial of her paternity and claim no part or share in her estate, so that, in consequence, he did not make a will, but died intestate.

Mary Green, intestate's mother, and appellant appear to have kept company for several months prior to their marriage, which evidently occurred at the time stated because of her pregnancy. The marriage was apparently voluntary on the part of appellant, and was with the consent of Mary's father, she being at the time under 18 years of age. After the wedding, appellant and his wife were received at the homes of their respective parents, and kindly treated. The father, mother, and sister of appellant testified that a room was set apart in the home for them, and that, during the short time they resided together, they were apparently congenial and happy. The reason assigned by Mary to her relatives for leaving her husband was that he refused to occupy the bed with her or to recognize her as his wife, and threatened to kill the baby when it was born, denying that he was its father. Appellant and his wife did, however, visit other relatives during the time they lived together. The evidence is without dispute that appellant never recognized or spoke to his wife after their separation, and that, although he knew of her fatal illness, he did not visit her or, after her death, attend her funeral; that he never in any way recognized Lucile as his daughter or contributed to her support. All of the parties resided in the same neighborhood, except about the last three years of Lucile's life, when she resided with Mrs. John W. Green, her mother's stepmother, at Lockridge, in Jefferson County. Appellant knew of Lucile's illness, but did not visit her and did not attend her funeral.

The evidence shows also without conflict that George A. Green and Mrs. Green, his stepmother, were very bitter toward

appellant. They never recognized or spoke to him after Mary returned home to live, except upon two occasions, when George quarreled with him.

It is evident that appellant would not have been received or treated cordially by the Greens, had he desired to see his wife or daughter. Lucile did not know that appellant was her father, until she attained school age. She was then informed that appellant was her father, and from that time forward was taught that he was unworthy, and not to recognize him as such. The estrangement between appellant and his wife, all of her people, and his daughter, appears to have been complete from the time of the separation. He was never asked to contribute to Lucile's support, and it is by no means clear that he would have been permitted to do so. Several witnesses testified to conversations with appellant in which he either denied or expressed doubt as to whether he was the father of Lucile. Sam Lininger, a nephew of John W. Green's, testified that appellant, in answer to an inquiry as to why he did not live with Mary, said:

"Well, I hadn't so much against Mary, but I will tell you, Sam, I don't own the child."

This conversation occurred 8 or 10 years after appellant and his wife separated. Clyde Hahn testified that, in a conversation with appellant about 11 years ago, appellant said he did not know whether the child was his or not. Ed Bowman testified that, in 1909, appellant told him that he did not know to whom the child belonged. Elmer Bowman testified that, upon one occasion, appellant said he "wasn't the only one implicated in the trouble," but did not specifically deny that he was the father of Lucile. Robert Cerhan testified to a conversation with appellant shortly before Mary's death, in which he said that "the kid wasn't his,—he didn't say 'child,'—the kid wasn't his; damned if he would live with her." At this time, he was on his way to see a lawyer about getting a divorce. George Davis testified that, about a week before appellant and Mary were married, the latter, when talking about her condition, said that the child didn't belong to him.

The above, except hearsay evidence as to the declarations of Mary, is all of the evidence introduced upon the subject of appellant's denial of Lucile's paternity. Appellant denied

making any of the statements attributed to him by the testimony of these witnesses. His denial is too sweeping. There is nothing in the record tending to impeach the veracity of these witnesses. Their testimony is in keeping with, and tends to explain, appellant's conduct and attitude toward his wife and daughter. Much of the testimony of conversations with John W. Green on the subject of making a will and the disposition of his property was objected to, upon the ground of the incompetency of the witnesses testifying thereto; but there is, in any event, suf-' ficient competent evidence in the record to show substantially all that is claimed by appellees on this point. George A. Green, his son, testified to the following conversation:

"I says to him: 'Pa, what is the matter with me having Charley Dutcher or somebody come out from Iowa City and make you out a will?' 'Well', he says, 'I'll go down town in the spring and attend to that myself. I intend to move this house to Liberty,'—or thinking of moving this house to Liberty. 'I will go and attend to that, and make provision for stepmother and Lucile.' "

Sam Lininger testified that Mr. Green said to him:

"Sam, I want to ask your advice. I says, 'Uncle why should you ask a younger man than you are for advice? You are an older man, and more experienced than I am.' I says, 'In regards to what?' 'Well,' he says, 'I am thinking of making a divide among my children, of about two thousand or about that. I offered them I would give them all two thousand, or something like that, provided they would buy land, put it in it, and, of course,' he says, 'Mary' (this was a short time after they were married), he says, 'Mary is married now to Lee, and I haven't land here.' He says, 'have a notion to go to Dakota and buy a farm for him, if I thought he would do all right,' and he wanted to know what I thought about it."

Witness further testified that there was a later conversation, substantially as follows:

"Well, I couldn't tell you all of it, but he was talking about it and he says, 'You know, Sam, what I spoke about before,' he says, 'I guess I will have to give it up about buying the land in Dakota.' He says, 'Lee has kinda disowned Mary, or the child,

and they are not living together, and I don't think that I will invest any money in North Dakota or South Dakota.' "

And a still later one, as follows:

"Well, he was speaking to me about it, and I advised him to change the name,—try to change the name,—or make a will; and he didn't think that Lee would. He says he didn't like to do that; he was going to make a change later on, he thought; he would fix it up then; he didn't think Lee would make him any trouble. Q. State what he said about Lee. You said you didn't think Lee would make any trouble; but what did he say? A. Well, he said he didn't think Lee would ever try to come in and claim any of Mary's property. Q. Did he say why? A. Well, he didn't think Lee would be,—he didn't just say,—I took it for granted,—he would be so low as to do that."

In substance, the foregoing is all of the evidence relied upon by appellees to bar appellant from claiming the estate of his daughter. Section 3380 of the Code provides that:

"If one of the parents is dead, the portion which would have gone to such deceased parent shall go to the survivor, including the portion which would have belonged to the intestate's spouse, had one been living."

Appellant is, therefore, the sole surviving heir at law of Lucile, and is entitled to receive her estate, unless appellees' plea of estoppel, as applied by the court below, is sustained upon this appeal. Proceeding upon the theory that the facts are as claimed by appellees, the question becomes one of law. It is not claimed that appellant ever talked with John W. Green, or with any member of the Green family, about Lucile's paternity, or that he ever made any statement at any time concerning the property inherited by her from her grandfather.

Much reliance is placed by appellees upon our holding in *McDowell v. McDowell*, 141 Iowa 286. In that case, the plaintiff was the widow, and the defendant the mother, of G. J. McDowell, the deceased. Shortly before his death, but when fully realizing that his end was near, the intestate said to his mother, in the presence of his wife, that he desired the latter to have all his property and to keep it, which she promised to do. He then asked his mother if that was all right, and she replied:

"Yes, Jack, it is. I don't want a cent you have got. You

and Rhoda have worked hard for what you have got, and I don't want it. She can have it."

Deceased then expressed his satisfaction, and died without making a will. We held that plaintiff was estopped from claiming any interest in her son's estate. In so holding, the court applied only general principles of equitable estoppel. But for the promises of the mother, which related directly to the disposition of his property, the intestate might have made a will, and in that way have carried out his expressed desire to give all of his property to his wife.

Many other cases in which general doctrines of equitable estoppel were applied, are also cited. In *Mohler v. Estate of Shank*, 93 Iowa 273, the plaintiff, formerly Mary Shank, wife of the deceased, demanded that her dower or distributive share be set off to her as his surviving widow. Some years before his death, the guardian of Anthony Shank brought an action and obtained a decree of divorce from Mary Shank, who thereafter married J. L. Mohler. The decree of divorce also provided for alimony, which was paid to her. The court held that, although the decree was void, Mary A. Mohler had, by treating it as valid, accepting the benefits thereof, and remarrying, estopped herself from asserting any claim, as surviving widow, to the estate of Anthony Shank. Other similar cases in this state and in other jurisdictions recognizing the principle of equitable estoppel applied in the *Mohler* case hold to the same effect. *White v. Harvey*, 175 Iowa 213; *Delbridge v. Delbridge*, 189 Iowa 1116; *Brett v. Brett*, 191 Iowa 262; *Arthur v. Israel*, 15 Colo. 147 (25 Pac. 81); *Marvin v. Foster*, 61 Minn. 154 (63 N. W. 484); *Gilpatrick v. Glidden*, 81 Me. 137; *Ransdel v. Moore*, 153 Ind. 393; *Garner v. Garner*, 38 Ind. 139; *Richeson v. Simmons*, 47 Mo. 20; *Yorston v. Yorston*, 32 N. J. Eq. 495; *Odiorne's Appeal*, 54 Pa. St. 175; *Baily v. Baily*, 44 Pa. St. 274; *Stephens v. Stephens*, 51 Ind. 542. In this connection, see *Dennis v. Harris*, 179 Iowa 121.

Most of the above cases involved the right of one or other of the parties to a void divorce decree to claim dower or distributive share in the estate of a deceased former spouse. The court in *Marvin v. Foster*, 61 Minn. 154 (63 N. W. 484), quoted

the following from 2 Bishop on Marriage & Divorce, Section 751a:

"If a party has used the privileges of a decree of divorce, he has thereby affirmed it, and he is too late to complain of any of its burdens. On this principle, where a man appealing from a decree dissolving his marriage married again, his appeal was dismissed; for, by the marriage, he had affirmed the validity of the divorce. Besides, to permit him to prosecute his appeal would be an injustice to his innocent second wife."

Contrasting the facts of the above cases with the facts of the case at bar, and applying the same general equitable principles thereto, can the judgment of the court below be sustained? No court has ever gone so far as to hold that expressions of doubt as to paternity, or the mere denial thereof, in the manner disclosed by the record, will estop the father from asserting a statutory right to inherit from such child if the paternity is established. Appellant admitted his paternity on the witness stand, and no one disputes it. In fact, everyone concedes that he is the father of Lucile. It is true that she was known during all of her life as Lucile Green, but the name of her father was dropped because of his alleged denials and conduct toward herself and her mother. Neither Lucile nor her mother was induced to change her position or relation to her property because of the denials and conduct of appellant. The basis of the doctrine of equitable estoppel is familiar. It is not sufficient to bar appellant's right to inherit from Lucile that he denounced her mother, drove her from him, or refused to recognize his daughter, as a man of good conscience and of fatherly instincts would have done. We have no disposition to mitigate or excuse the alleged reprehensible conduct of appellant.

Assuming, without deciding, that, if such facts were established in this case as would have created an estoppel against appellant in favor of John W. Green, Lucile's grandfather, in the disposition of his property, the same facts might be set up in this case to bar the right of appellant to receive the estate of his daughter as her sole surviving parent, are the facts disclosed by the record sufficient for that purpose?

Appellant was not an heir of John W. Green's, and no affirmative act on his part was necessary to prevent appellant from

sharing in his estate. The only way appellant could profit by John W. Green's dying intestate was through Lucile. The most that can be claimed for the testimony of George A. Green and Sam Lininger is that it reveals a doubt in the mind of John W. Green as to whether appellant would ever assert a claim to the estate of Lucile. Perhaps what he said indicated a belief on his part that appellant would never make a claim which required him to acknowledge the paternity of Lucile. It is quite clear, however, that he did not rely upon the conduct or declarations of appellant in refraining from making a will. On the other hand, he declared his intention of doing so, and of making provision for both Lucile and his wife. He died, however, without doing so. All of the denials and declarations attributed to appellant were either made during the lifetime of his wife or a good many years before the death of Lucile. The elements of equitable estoppel are wanting. The record fails to show that John W. Green relied upon or was misled in the disposition of his property by either the conduct or the declarations of appellant. Lucile was a minor, and under the guardianship of appellees at the time of her death. The alleged unworthiness of the father is not alone sufficient. Neither his denials nor his conduct are shown to have been responsible for the status of Lucile's estate, nor has he in any way profited or received benefits on account of his denials or conduct.

It follows that the judgment of the court below must be reversed, and the cause remanded, with directions that an order be entered establishing appellant's right, as the sole surviving parent of the deceased, to inherit her estate.—*Reversed.*

ARTHUR, C. J., DE GRAFF and VERMILION, JJ., concur.